UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

ANA MARGARITA MARTINEZ,

                Plaintiff,

    -against-                      1:14-CV-00856 (LEK/CFH)

THE REPUBLIC OF CUBA,

                Defendant.

_____

## MEMORANDUM-DECISION AND ORDER

## I.    INTRODUCTION

In the present action, Plaintiff Ana Margarita Martinez seeks to enforce a default

judgment against the Republic of Cuba. Dkt. No. 39 ("1610(c) Motion"). Martinez brought suit

against Cuba in the Eleventh Judicial Circuit of Florida, asserting acts of torture and the

commission of a tortious act under the Foreign Sovereign Immunities Act ("FSIA"). Id. at 3–4.

On March 9, 2001, the Florida state court entered a default judgment in favor of Martinez in the

amount of $7,175,000. Dkt. No. 39-3 ("Florida Judgment") at 22. On December 7, 2007, the

Southern District of New York extended full faith and credit to the default judgment, Dkt. No.

39-1 ("SDNY Judgment"), and on April 22, 2015, this Court likewise recognized Martinez's

judgment, Dkt. Nos. 18 ("NDNY Judgment"), 19.

Presently before the Court is Martinez's motion seeking an order directing Thomas P.

DiNapoli, New York State Comptroller, to turn over assets located in the Northern District of

New York that are being held by the Comptroller as custodian of abandoned property. Dkt. No.

41 ("Turnover Motion"). In particular, Martinez seeks turnover of two Banco Nacional accounts

that this Court deemed Cuban property subject to turnover in an earlier order involving different

plaintiffs. Id. at 1; Volloldo v. Ruz, No. 14-MC-25, 2016 WL 81492, at *20 (N.D.N.Y. Jan. 7, 2016) (Kahn, J.). Martinez also filed a Motion for Entry of a 28 U.S.C. § 1610(c) Order. 1610(c) Mot. The Comptroller opposes both of Martinez's motions, Dkt. No. 48 ("Response"), and Martinez filed a Reply, Dkt. No. 54 ("Reply"). For the following reasons, Martinez's 1610(c) Motion and Turnover Motion are denied.

## II.    BACKGROUND

### A.  Factual Background[1]

In February 1992, Juan Pablo Roque, a Cuban spy, swam to the Guantanamo Bay Naval Base on the pretense that he was a "military defector from Cuba." Fla. J. at 3. Roque's mission was to infiltrate the Cuban expatriate community in Miami and conduct espionage on behalf of the Cuban government. Id. at 1–2. Accordingly, when he arrived in Miami in March 1992, he began integrating himself into the Cuban exile community. Id. at 3. He started going to a church attended by Martinez, who "saw him regularly at religious services and church events." Id. After formally meeting at a church-related event in May 1992, the two started dating. Id. Cuba ordered Roque to romantically pursue Martinez, whom he married after three years of dating. Id. Unbeknownst to Martinez, "Roque was using her as an unwitting pawn to legitimize his presence in Miami by establishing a credible cover for his covert espionage activities on behalf of the Cuban Government." Id. Roque performed espionage as part of a spy ring known as the "Wasp Network," which took orders from Cuba. Id. at 4. Roque used the cover provided by his marriage to "infiltrate[] Miami-based organizations that have humanitarian missions directed toward Cuba

---

[1]  The following facts are drawn from the Florida state court's findings of fact. Fla. J.

or desire democracy for Cuba." Id. at 3. At the same time, he became an established member of the Cuban exile community in Miami. Id.

On February 23, 1996, Roque left home and went to Havana, Cuba. Id. at 4. He had told Martinez that he was going on a business trip, but she realized what actually happened when, two days later, Roque gave an interview to CNN in which he said he had returned to Cuba because he was "disillusioned with life in the United States." Id. Although it is not clear from the Florida Judgment, it appears that he also revealed that he had been performing espionage on behalf of the Cuban government. Id. Stunned by the news that her husband was a Cuban spy, Martinez became "emotionally distraught." Id. at 5. Her distress was compounded by the exile community's suspicion that she was "conspiring" with her husband. Id. She had her marriage annulled on October 15, 1996, on account of Roque's fraud. Id. Finally, "[s]he required medical and psychological care and was left saddled with debt . . . incurred by Roque while he was married to her." Id. at 6.

## B. Procedural History

Cuba was served with process in the Florida state proceedings but failed to appear, "assert[ing] in a diplomatic note that the Courts in the United States have no jurisdiction over Cuba." Id. at 8. On March 9, 2001, following the entry of default and a non-jury trial, the Florida state court found that Cuba was liable under 28 U.S.C. §§ 1605(a)(7)[2] and 1605(a)(5) for acts of

---

[2] As the Second Circuit pointed out, "in 2008, Congress repealed § 1605(a)(7) and created a new section [§ 1605A] specifically devoted to the terrorism exception to the jurisdictional immunity of a foreign state." Weinstein v. Islamic Republic of Iran, 609 F.3d 43, 48 n.4 (2d Cir. 2010) (citing National Defense Authorization Act for Fiscal Year 2008, Pub. L. 110-181, Div. A, § 1803, 122 Stat. 341 (2008)). However, at least for purposes of this case, "§ 1605A provides for the same exceptions to foreign sovereign immunity as the repealed section." Id.

torture and battery suffered by Martinez at the hands of Roque. Id. at 8–11. These findings

formed the basis of the court's conclusion that it had subject matter jurisdiction over Martinez's

case. Id. The court awarded Martinez $7,175,000 in compensatory damages, noting that it was

"outraged by the defendant Cuba's conduct and would have awarded 20 million in punitive

damages if it could." Id. at 22.

Martinez commenced the present action on July 11, 2014. Dkt. No. 1. After registering

her default judgment with the Court, NDNY J., Martinez served a Writ of Execution on the

Comptroller, Dkt. No. 24. Martinez subsequently filed a 1610(c) Motion seeking an order

"holding that all conditions precedent to [Martinez's] request to attach, execute and seek turnover

against blocked assets of the Defendant have been met and that a reasonable period of time has

elapsed following the entry of judgment and the giving of notice to Defendant." 1610(c) Mot at

1. Martinez also filed her Turnover Motion seeking turnover of two Banco Nacional accounts

held by the Comptroller. Turnover Mot. The Comptroller opposes the motions, arguing that the

Florida state court that issued the original default judgment lacked subject matter jurisdiction

over the case, Resp. at 4–11, and that the Banco Nacional accounts are not subject to turnover, id.

at 12.

III.     **LEGAL STANDARD**

The FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in the

courts of this country." Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 434

(1989). Foreign states are immune from the jurisdiction of federal and state courts unless one of

the exceptions contained in §§ 1605–1607 applies. 28 U.S.C. § 1604. The "terrorism

exception"—codified at § 1605A—"abrogates immunity for those foreign states officially

designated as state sponsors of terrorism by the Department of State where the foreign state

commits [torture] or provides material support for the commission of . . . [torture,] and the act

results in the death or personal injury of a United States citizen." <u>Weinstein</u>, 609 F.3d at 48.

Cuba was designated as a state sponsor of terrorism in 1982. <u>Weininger v. Castro</u>, 462 F. Supp.

2d 457, 479 (S.D.N.Y. 2006) (citing Clarification for Foreign Policy Export Controls, 47 Fed.

Reg. 16,623 (Apr. 19, 1982)). The FSIA also abrogates sovereign immunity for foreign states

where "money damages are sought against a foreign state for personal injury . . . occurring in the

United States and caused by the tortious act or omission of that foreign state or of any official or

employee of that foreign state while acting within the scope of his office or employment." 28

U.S.C. § 1605(a)(5). However, this exception to immunity, known as the "noncommercial tort

exception," <u>In re Terrorist Attacks on September 11, 2011</u>, 714 F.3d 109, 115 (2d Cir. 2013),

does not apply to claims based on "misrepresentation" or "deceit," among other things, 28 U.S.C.

§ 1605(a)(7)(B).

## IV.    DISCUSSION

The Comptroller asks the Court to consider whether the Florida state court that issued

Martinez's original default judgment had subject matter jurisdiction under the terrorism

exception of the FSIA. Resp. at 4–11. The Comptroller argues that Roque's conduct, while

"despicable," does not qualify as "torture" under the FSIA. <u>Id.</u> at 10. Although the Comptroller

does not argue that the Florida state court lacked jurisdiction under the noncommercial tort

exception of the FSIA, the Court will also consider that issue because it was one of the two bases

on which the Florida court found subject matter jurisdiction (the other basis for jurisdiction was

the terrorism exception). Fla. J. at 11. Martinez responds that the Comptroller has not pointed to

any jurisdictional defect in the Florida court's default judgment, and that in any event this Court should not second-guess that court's determination that it had subject matter jurisdiction to hear the case. Reply at 4–8.

### A. Subject Matter Jurisdiction

The Full Faith and Credit Act provides that "judicial proceedings . . . shall have the same full faith and credit in every court within the United States . . . as they have by law or usage in the courts of [the] State [in which they took place]." 28 U.S.C. § 1738. Thus, "a federal court must give to a state-court judgment the same preclusive effect as would be given that judgment under the law of the State in which the judgment was rendered." Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 80 (1984). However, "a judgment of a court in one State is conclusive upon the merits in a court in another State only if the court in the first State had power to pass on the merits—had jurisdiction, that is, to render the judgment." Underwriters Nat'l Assurance Co. v. N.C. Life & Acc. & Health Ins. Guar. Ass'n, 455 U.S. 691, 704 (1982) (quoting Durfee v. Duke, 375 U.S. 106, 110 (1963)). "Consequently, before a court is bound by the judgment rendered in another State, it may inquire into the jurisdictional basis of the foreign court's decree. If that court did not have jurisdiction over the subject matter or the relevant parties, full faith and credit need not be given." Id. at 705; see also Kremer v. Chem. Constr. Corp., 456 U.S. 461, 482 (1982) ("A State may not grant preclusive effect in its own courts to a constitutionally infirm judgment, and other state and federal courts are not required to accord full faith and credit to such a judgment." (footnote omitted)).

The Comptroller collaterally attacks the Florida Judgment, "respectfully request[ing]" this Court to consider whether the Florida state court had subject matter jurisdiction over the case.

Resp. at 4.[3] Thus, the inquiry for the Court is whether the Florida state court lacked subject matter jurisdiction to enter judgment against Cuba. In particular, the Court must determine whether the Florida state court erred in finding that the terrorism and noncommercial tort exceptions of the FSIA applied.

However, "[i]t has long been the rule that principles of res judicata apply to jurisdictional determinations—both subject matter and personal." Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 702 n.9 (1982). "[A] judgment is entitled to full faith and credit—even as to questions of jurisdiction—when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment." Underwriters, 455 U.S. at 706 (quoting Durfee, 375 U.S. at 111). On the other hand, while "[a] court entering a default judgment may assume that it has jurisdiction over the defendant when the defendant does not appear in court to contest the judgment, . . . that assumption does not preclude the defendant from later contesting jurisdiction in the enforcing court." Transaero, Inc. v. La Fuerza Aerea Boliviana, 162 F.3d 724, 730 (2d Cir. 1998); see also Weininger, 462 F. Supp. 2d at 472 ("[W]here a judgment is rendered by default, it is not always clear whether . . . an opportunity to contest any jurisdictional deficiency actually existed."). Several of our sister circuits have taken the position that jurisdictional findings made as part of a

_____

[3] The Court notes that in Volloldo, 2016 WL 81492, at *4, it was confronted with a request by the Comptroller to consider the jurisdiction of the court that rendered the default judgment at issue in that case. Because the Comptroller in Volloldo refused to take a position on whether the Court should grant the plaintiffs' § 1610(c) motion, the Court found that the Comptroller was not collaterally attacking the judgment. Id. However, in the present case, the Comptroller explicitly opposes both the 1610(c) Motion and the Turnover Motion, Resp. at 4, and therefore the Court deems it to be making a collateral attack on the Florida state court's judgment.

default judgment rendered without an appearance by the defendant are not entitled to preclusive effect. See, e.g., Jerez v. Republic of Cuba, 775 F.3d 419, 422 (D.C. Cir. 2014) (stating that jurisdictional determinations made in a default judgment are not entitled to res judicata effect if the defendant did not "actually appear[]" in the proceedings); American Steel Bldg. Co. v. Davidson & Richardson Constr. Co., 847 F.2d 1519, 1521 (11th Cir. 1988) ("[W]here the defendant does not appear, and judgment is by default, the state court judgment does not preclude the federal court from reviewing the jurisdictional issues."). Moreover, a garnishee such as the Comptroller has standing to bring a collateral attack against a jurisdictionally defective default judgment. See Weininger, 462 F. Supp. 2d at 473.

Under the FSIA, a court may enter a default judgment against a foreign state only if the plaintiff "establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); see also Commercial Bank of Kuwait v. Rafidain Bank, 15 F.3d 238, 242 (S.D.N.Y. 1994) ("[W]hen . . . a foreign sovereign defaults, the district court must determine whether the plaintiff's allegations are supported by evidence."). Mindful of this standard, the Court now turns to address the two bases for jurisdiction asserted in the Florida Judgment, namely, the terrorism exception and the noncommercial tort exception.[4]

---

[4] The Court would be obligated to address the jurisdictional basis of the Florida state court judgment even if it applied the rules regarding jurisdiction supplied by Florida law. See Jerez, 775 F.3d at 423 (finding that examination of the jurisdictional basis for a default judgment issued against the Republic of Cuba by a Florida state court was appropriate under Florida law because "[a] judgment entered by a court which lacks subject matter jurisdiction is void and subject to collateral attack under [Florida law]." (citing McGhee v. Biggs, 974 So. 2d 524, 526 (Fla. Dist. Ct. App. 2008))).

*1. The Terrorism Exception of the FSIA*

As noted above, the terrorism exception of the FSIA abrogates a foreign state's sovereign immunity where (1) "money damages are sought against a foreign state for personal injury or death that was caused by an act of torture [committed by the state or any of its employees or agents]" and (2) "the foreign state was designated as a state sponsor of terrorism at the time [of] the act . . . or was so designated as a result of such act." 28 U.S.C. § 1605A.[5] Under 28 U.S.C. § 1605A(h)(7), the FSIA incorporates the definition of "torture" used in the Torture Victim Protection Act of 1991 ("TVPA"). Under the TVPA, torture is defined as:

> any act, directed against an individual in the offender's custody or physical control, by which severe pain or suffering . . . , whether physical or mental, is intentionally inflicted on that individual for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

Pub. L. No. 102-256, § 3(b)(1), 106 Stat. 73, 73 (1992). The TVPA defines "mental pain or suffering" as:

> prolonged mental harm caused by or resulting from—
>
> (A) the intentional infliction or threatened infliction of severe physical pain or suffering;
>
> (B) the administration or application, or threatened administration or application, of mind altering substances or other procedures calculated to disrupt profoundly the senses or the personality;
>
> (C) the threat of imminent death; or

---

[5] As noted above, Cuba was designated as a state sponsor of terrorism in 1982, well before the events at issue in this case. <u>Weininger</u>, 462 F. Supp. 2d at 479 (citing Clarification for Foreign Policy Export Controls, 47 Fed. Reg. at 16,623).

> (D) the threat that another individual will imminently be subjected to death, severe physical pain or suffering, or the administration or application of mind altering substances or other procedures calculated to disrupt profoundly the senses or personality.

Id. § 3(b)(2).

The Florida state court did not consider the application of the statutory language to the facts presented by Martinez's case. Instead, it appears to have rested its finding of jurisdiction under the terrorism exception on the allegation that Martinez suffered serious emotional distress as a result of the revelation that her husband was a Cuban spy. Fla. J. at 17. The closest the court came to an application of the relevant law to the facts was its conclusory assertion that Martinez was "a victim of . . . torture inflicted upon her while under the physical control of an agent of the Cuban government acting with the scope of his employment." Id. at 17–18. However, there is no indication that Martinez was ever in the custody or physical control of Roque, a prerequisite for a finding that torture occurred under the statute. True, he married her under false pretenses, and he used the cover provided by the marriage to establish himself in the Cuban exile community and thereby conduct espionage for the Cuban government. Id. at 3. But this hardly demonstrates the kind of immediate physical control over another person that is necessary to establish torture under the FSIA. See, e.g., Moradi v. Islamic Republic of Iran, 77 F. Supp. 3d 57, 68 (D.D.C. 2015) (finding that the definition of torture under the FSIA was satisfied where "[the plaintiff's] interrogators frequently subjected him to severe physical and mental pain, including threatening him with death and dismemberment, physically beating him, sexually assaulting him, and keeping him in excruciatingly painful positions for hours at a time during the interrogations"). Nowhere is it suggested that Martinez was not free to leave Roque at any time. Indeed, it appears

that their marriage was completely normal until the night Roque abandoned her and returned to Cuba. Because Martinez never showed that she was subject to the custody or physical control of Roque, subject matter jurisdiction under the terrorism exception of the FSIA was plainly lacking.

Moreover, there is no indication that Roque, while a rogue, intentionally inflicted severe pain or suffering on Martinez in order to extract information from her, to discriminate against her, or to punish her. § 3(b)(1). Roque's mission appears to have been to provide the Cuban government with information about the activities of the Cuban exile community. Fla. J. at 3–4. Martinez was useful to him solely as a means of "legitimiz[ing] his presence [in the exile community]." Id. at 3. Torturing her in the sense adopted by the FSIA and the TVPA simply had no place in Roque's espionage activities, and in any case there are no allegations that he obtained any information from her that would be relevant to those activities. Further, there is no evidence that Roque ever inflicted or threatened to inflict severe *physical* pain or suffering on Martinez, which is one of ways in which a plaintiff may demonstrate mental pain or suffering under the TVPA. § 3(b)(2)(A). Nor is there any indication that Roque administered or threatened to administer mind-altering substances to her, that he threatened her with imminent death, or that he made threats to her regarding actions he would take toward another individual. § 3(b)(2)(B)–(D). These considerations provide another reason for concluding that the Florida state court lacked subject matter jurisdiction under the terrorism exception. Accordingly, because there was no plausible ground on which the Florida state court could find that the terrorism exception of the

FSIA abrogated Cuba's immunity in this case, the Court finds that subject matter jurisdiction under this exception was lacking.[6]

### 2. The Noncommercial Tort Exception of the FSIA

As mentioned above, the FSIA provides that a foreign state's sovereign immunity is lost where:

> money damages are sought against [the] state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that . . . state or of any official or employee of that . . . state while acting within the scope of his office or employment.

28 U.S.C. § 1605(a)(5). In order for the noncommercial tort exception to apply, the entire tort, including the conduct causing the injury and the injury itself, must occur in the United States. In re Terrorist Attacks on September 11, 2011, 714 F.3d at 115–16. "It has repeatedly been recognized that, although cast in general terms, the 'tortious act' exception was designed primarily to remove immunity for cases arising from traffic accidents." MacArthur Area Citizens Ass'n v. Republic of Peru, 809 F.2d 918, 921 (D.C. Cir. 1987) (citing Asociacion de Reclamantes v. United Mexican States, 735 F.2d 1517, 1525 (D.C. Cir. 1984)). While this does not mean that the noncommercial tort exception extends only to traffic accidents, "the legislative history counsels that the exception should be narrowly construed so as not to encompass the farthest reaches of common law." Id.; see also Doe v. Federal Democratic Republic of Eth., No. 14-CV-372, 2016 WL 3023996, at *14 (D.D.C. May 24, 2016) (stating that, when the allegedly

---

[6] In her Reply, Martinez asserts that "[t]he mental anguish and torture that Ms. Martinez suffered as a result of Roque's and the Cuban Government's acts cannot be dismissed as a simple tort, unconnected to the terrorist plot and acts of torture." Reply at 7. However, Martinez provides no evidence that Roque's actions fell within the statutory definition of torture set out above.

tortious conduct at issue is "far afield from the paradigmatic case" of traffic accidents, courts should "proceed cautiously"). Moreover, the noncommercial tort exception is inapplicable to claims based on "misrepresentation" or "deceit," among other things. 28 U.S.C. § 1605(a)(7)(B). Finally, "[i]n determining whether an alleged action is a tort, [courts] appl[y] the law of the state in which the locus of injury occurred." Swarna v. Al-Awadi, 622 F.3d 123, 144 (2d Cir. 2010) (citing Robinson v. Gov't of Malay., 269 F.3d 133, 142 (2d Cir. 2001)).

The Florida state court found subject matter jurisdiction under the noncommercial tort exception on the ground that Roque, while acting within the scope of his employment as a Cuban spy, had committed a battery against Martinez under Florida law.[7] Fla. J. at 18–20. The theory was that Martinez would not have agreed to have sexual intercourse with Roque if she had known that he was a Cuban spy. Id. at 19. Roque's failure to inform Martinez of his occupation therefore vitiated her consent to sexual relations with him. Id. This, according to the Florida state court, was sufficient to state a cause of action for battery. Id.

Since the Florida state court never set out the elements of battery, the Court notes that Florida law requires a plaintiff attempting to state a claim for battery to prove "(1) the intent to cause a harmful or offensive contact with another person; and (2) an offensive contact that directly or indirectly results." Rubio v. Lopez, 445 F. App'x 170, 175 (11th Cir. 2011) (per curiam) (citing Chorak v. Naughton, 409 So. 2d 35, 39 (Fla. Dist. Ct. App. 1981)). In addition, the contact must take place without the defendant's "express or implied consent." Spelta v.

---

[7] Neither party disputes that Florida supplies the substantive law for purposes of determining whether subject matter jurisdiction existed under the noncommercial tort exception. Since the injuries alleged by Martinez occurred in Florida, the locus of injury is Florida, and therefore Florida state law applies here. Swarna, 622 F.3d at 144.

Delicatessen Support Servs., Inc., 57 F. Supp. 2d 1327, 1358 (M.D. Fla. 1999). Given the lack of clear precedent on the state-law issues discussed in this section, the Court's task is to determine "how the state's highest court would rule in the case." Anderson v. Hedstrom Corp., 76 F. Supp. 2d 422, 431 (S.D.N.Y.1999) (citing Francis v. INA Life Ins. Co. of N.Y., 809 F.2d 183, 185 (2d Cir. 1987)). Moreover, "the decision of an intermediate state court on a question of state law is binding . . . unless [the court] find[s] persuasive evidence that the highest state court would reach a different conclusion." Entron, Inc. v. Affiliated FM Ins. Co., 749 F.2d 127, 132 (2d Cir. 1984) (citing St. Clair v. E. Air Lines, Inc., 302 F.2d 477, 481 (2d Cir. 1962)).

At the outset, the Court notes that the only two cases cited by the Florida state court to support its understanding of battery under Florida law are inapposite to Martinez's situation. The court cited Hogan v. Tavzel, 660 So. 2d 350, 352–53 (Fla. Dist. Ct. App. 1995), for the proposition that "[o]ne must give knowing consent to sexual intercourse, and by operation of law, consent is vitiated if it is procured by fraud or concealment." Fla. J. at 18. However, Hogan cannot be read that broadly. In Hogan, the defendant had sexual intercourse with the plaintiff without disclosing that he had a sexually transmitted disease. 660 So. 2d at 351. The plaintiff, who was not aware of the defendant's condition, contracted the disease. Id. The court held that those facts were sufficient to state a cause of action for battery, since "consent to sexual intercourse is not the equivalent of consent to be infected with a venereal disease." Id. at 352. As the court noted, this position is "the well established, majority view." Id. at 353. The other case cited by the Florida state court, Wheeland v. Wheeland, No. 93-9072, 1993 WL 807885 (Fla. Cir. Ct. Aug. 26, 1993), is a summary of a settlement agreement involving the same kind of fact pattern as Hogan. It does not elaborate on the discussion of battery in Hogan.

14

Unlike the plaintiffs in <u>Hogan</u> and <u>Wheeland</u>, here Martinez did not contract a sexually transmitted disease or suffer any kind of physical injury as a result of the alleged battery. The Florida state court cited no authority remotely supporting the view that deception about one's occupation can vitiate consent to sexual intercourse. More importantly, after carefully reviewing Florida battery law, this Court cannot find a single case adopting the Florida state court's theory of battery. In the absence of binding precedent on this question, the Court is entitled to examine "the general weight and trend of authority" in ascertaining how the state's highest court would decide the question. <u>Reyes v. City of New York</u>, 992 F. Supp. 2d 290, 301 (S.D.N.Y. 2014). The overwhelming weight of authority in other jurisdictions is that in the context of sexual relations, deceptions such as that practiced by Roque cannot as a matter of law give rise to battery claims. <u>E.g.</u>, <u>Conley v. Romeri</u>, 806 N.E.2d 933, 939 (Mass. App. Ct. 2004) (refusing to recognize a battery claim where defendant misled plaintiff about his ability to have children and plaintiff relied on that misrepresentation in agreeing to have sexual relations with him); <u>C.A.M. v. R.A.W.</u>, 568 A.2d 556, 557–58 (N.J. Super. Ct. App. Div. 1990) (endorsing the view that courts should not adjudicate tort claims involving promises between consenting adults concerning private sexual relations). This is in marked contrast to the state of the law regarding battery claims arising out of the knowing transmission of sexually transmitted diseases to individuals who are unaware of their partners' condition. As <u>Hogan</u> emphasized, that situation has regularly been found to give rise to battery claims. 660 So. 2d at 353. Thus, in finding jurisdiction on this basis, the Florida state court ignored its duty to construe the noncommercial tort exception of the FSIA "so as not to encompass the farthest reaches of common law." <u>MacArthur Area Citizens Ass'n</u>, 809 F.2d at 921.

At least one Florida court has endorsed the rationale behind decisions from courts in other jurisdictions that refused to recognize tort claims premised on romantic deception. A representative statement of this rationale can be found in Stephen K. v. Roni L., 164 Cal. Rptr. 618 (Cal. Ct. App. 1980). There, the court justified its dismissal of a tort claim based on sexual deception on the ground that it would not "supervise the promises made between two consenting adults as to the circumstances of their private sexual conduct." Id. at 620. In Mims v. Mims, 305 So. 2d 787, 788 (Fla. Dist. Ct. App. 1974), a case decided by District Court of Appeal of Florida, Fourth District, the defendant "induced [the plaintiff] to marry him with false and fraudulent protestations of love." The defendant then "left [the plaintiff] after only ten days of married life . . . [telling] her he did not love her and that she would have to leave." Id. The court refused to recognize the tort claims asserted by the plaintiff, stating that "domestic quarrels" of this sort "should not be the subject of damage suits and jury trials." Id. at 789. The Mims court's reluctance to entertain tort claims based on romantic deception provides another reason to doubt that Florida law recognizes the theory of battery adopted by the Florida state court in this case. See Entron, Inc, 749 F.2d at 132 ("[T]he decision of an intermediate state court on a question of state law is binding . . . unless we find persuasive evidence that the highest state court would reach a different conclusion." (citing St. Clair, 302 F.2d at 481)).

The Court finds that recognition of a battery claim in this context would stretch the law of battery beyond its limits, something strongly discouraged by the FSIA. MacArthur Area Citizens Ass'n, 809 F.2d at 921. Moreover, the lack of support in either Florida law or the law of other jurisdictions for the theory of liability adopted by the Florida state court in this case makes it exceedingly unlikely that the Florida Supreme Court would recognize a battery claim in this

context. Thus, the Court holds that, in this case, subject matter jurisdiction under the noncommercial tort exception of the FSIA cannot be based on the theory that Roque committed a battery against Martinez.

The Court rejects both of the bases for subject matter jurisdiction asserted by the Florida state court, but that does not end the inquiry. "[T]he district court must look at the substance of the allegations to determine jurisdiction [under the FSIA]." Cargill Int'l S.A. v. M/T Pavel Dybenko, 991 F.2d 1012, 1019 (2d Cir. 1993). Thus, the Court proceeds to consider whether Martinez's allegations state any plausible basis for subject matter jurisdiction under the noncommercial tort exception of the FSIA.

Mindful of the precept that "the [noncommercial tort] exception should be narrowly construed so as not to encompass the farthest reaches of common law," MacArthur Area Citizens Ass'n, 809 F.2d at 921, the Court finds that the facts alleged by Martinez fail to state a tort claim under Florida law that satisfies the noncommercial tort exception. It seems clear that Roque committed fraud and deceit against Martinez by misrepresenting his occupation and political allegiances to her, thereby causing her to suffer severe emotional injury. See Food Fair, Inc. v. Anderson, 382 So. 2d 150, 154 (Fla. Dist. Ct. App. 1980) (describing the elements of the tort of fraud and deceit). However, this theory of liability does not help Martinez, because the FSIA states that the noncommercial tort exception is inapplicable to claims arising out of "misrepresentation" or "deceit," among other things. 28 U.S.C. § 1605(a)(7)(B). Under this exception to the exception, "any claim of which misstatements are an essential element is deemed to be a claim arising out of misrepresentation or deceit and, therefore, not cognizable under the . . . FSIA." Travel Assocs. v. Kingdom of Swaziland, No. 89-CV-1235, 1990 WL

134512, at *3 (D.D.C. Aug. 30, 1990) (citing <u>Block v. Neal</u>, 460 U.S. 289, 296–98 (1983)).

Since the tort of fraud and deceit under Florida law requires a showing of a false statement or

misrepresentation made by a plaintiff, <u>see</u> <u>Food Fair, Inc.</u>, 382 So. 2d at 154, it clearly falls under

the exception for claims premised on misrepresentation or deceit.

The facts alleged by Martinez might also be read to state a claim for intentional infliction

of emotional distress, which can be established under Florida law by showing that "(1) the

wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous; (3) the conduct

caused emotional distress; and (4) the emotional distress was severe." <u>Williams v. Worldwide</u>

<u>Flight SVCS., Inc.</u>, 877 So. 2d 869, 870 (Fla. Dist. Ct. App. 2004) (citing <u>De La Campa v.</u>

<u>Grifols America, Inc.</u>, 819 So. 2d 940, 943 (Fla. Dist. Ct. App. 2002)). Roque was arguably

reckless in giving an interview to CNN in which he revealed that he was a Cuban spy, since she

was bound to find out about what he said in the interview. In agreeing to give the interview, he

was also acting in a way that could be considered outrageous, and Martinez has alleged that she

suffered severe emotional distress as a result of the revelation that her husband was a Cuban spy.

The problem is that this claim is not cognizable under the noncommercial tort exception. This is

because the noncommercial tort exception requires that the entire tort, including the conduct and

the injury, occur in the United States. <u>In re Terrorist Attacks on September 11, 2011</u>, 714 F.3d at

115–16. It appears that Martinez suffered emotional distress only as a result of viewing the CNN

interview, because until then she had been under the impression that Roque was on a business

trip. Fla. J. at 4–5. Roque gave this interview in Havana, Cuba. <u>Id.</u> at 4. Thus, the conduct that

directly caused Martinez's injury did not occur in the United States. The tort was simply not

complete until Roque engaged in certain conduct in Cuba. <u>See</u> <u>Federal Democratic Republic of</u>

Eth., 2016 WL 3023996, at *12 ("[T]he question of where the 'entire tort' occurred cannot be . . . divorced from the physical location of the tortfeasors."). Accordingly, Martinez cannot satisfy the rule that the entire tort must occur in the United States.

Finally, to the extent that Martinez was attempting to allege a claim for negligent infliction of emotional distress, that claim must fail because Martinez did not suffer any kind of physical impact, and there is no evidence that her emotional distress manifested itself in any kind of physical injury. See Willis v. Gami Golden Glades, LLC, 967 So. 2d 846, 850 (Fla. 2007) (stating that a claim for negligent infliction of emotional distress requires either some kind of physical impact suffered by the plaintiff or mental distress that manifests itself in the form of physical injury).

Even if the noncommercial tort exception were found to apply to this case, Martinez would be unable to execute on her default judgment on that basis. That is because Martinez's default judgment was obtained against the Republic of Cuba and not against one of its agencies or instrumentalities. If jurisdictional immunity were predicated on the noncommercial tort exception, Martinez could attempt to use 28 U.S.C. § 1610(b)(2) to execute on the judgment, but because that provision requires that the "judgment relate[] to a claim for which the agency or instrumentality is not immune," it is inapplicable to Martinez's judgment, which, to repeat, is against Cuba itself. See Walters v. Indus. & Commercial Bank of China, 651 F.3d 280, 298 (2d Cir. 2011) ("[B]ecause petitioners' default judgment is against China itself, rather than an agency or instrumentality, the judgment does not relate to a claim 'for which the agency or instrumentality is not immune' from jurisdiction."). Moreover, to the extent that Martinez is attempting to execute on her judgment on the basis of the Terrorism Risk Insurance Act

("TRIA"), Pub. L. No. 107-297, 116 Stat. 2322 (2002), that avenue to execution immunity is foreclosed as well. Roque's behavior toward Martinez cannot be classified as an "act of terrorism" under the TRIA because there is no evidence that Martinez's judgment against Cuba is based on Roque's committing a "violent act" or "an act that is dangerous to . . . human life[,] property[,] or infrastructure." <u>Id.</u> § 102(1)(A). Also, Roque's behavior does not fit the definition of terrorism contained in the Immigration and Nationality Act. 8 U.S.C. § 1182(a)(3)(B)(iii).

### 3. Summary

Since the Court fails to find any basis for subject matter jurisdiction under the noncommercial tort and terrorism exceptions of the FSIA, and no other FSIA exception is applicable, the Court concludes that the default judgment rendered by the Florida state court is invalid for lack of subject matter jurisdiction. Accordingly, the Court cannot allow Martinez to enforce the default judgment in this case. Therefore, the Court denies Martinez's 1610(c) and Turnover Motions.

The Court emphasizes that, in denying enforcement of Martinez's default judgment, it is not acting to protect assets of the Cuban government against plaintiffs who have claims to them. Indeed, enforcing Martinez's jurisdictionally defective judgment would reduce the pool of such assets available to plaintiffs who have suffered wrongs at the hands of the Cuban government that are cognizable under the FSIA. While the Court recognizes the efforts of the Florida state court to afford Martinez a remedy for the grievous harm inflicted on her by Roque and the Cuban government, the Court is simply unable to give legal redress for her sad and difficult plight.

**V.     CONCLUSION**

Accordingly, it is hereby:

**ORDERED**, that Plaintiff's Motion for Entry of a 28 U.S.C. § 1610(c) Order (Dkt. No. 39) is **DENIED**; and it is further

**ORDERED**, that Plaintiff's Motion for Turnover (Dkt. No. 41) is **DENIED**; and it is further

**ORDERED**, that the default judgment (Dkt. Nos. 18, 19) entered by this Court against Defendant is **VACATED**; and it is further

**ORDERED**, that the Writ of Execution (Dkt. No. 24) issued by this Court is **VACATED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Memorandum-Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**


DATED:        November 21, 2016
              Albany, New York

Lawrence E. Kahn
U.S. District Judge